# PELTON GRAHAM LLC

111 BROADWAY, SUITE 1503, NEW YORK, NEW YORK 10006
T 212.385.9700 ‖ F 212.385.0800 ‖ WWW.PELTONGRAHAM.COM

**BRENT E. PELTON, ESQ.**　　　　　　　　　　　　　　　　　　　　　　　　SEPTEMBER 18, 2020
PELTON@PELTONGRAHAM.COM

**VIA ECF**

Honorable Valerie Caproni
United States District Court
Southern District of New York
40 Foley Square, Room 240
New York, New York 10007

　　　　Re:　*Martinez, et al. v. Midspan Telecom Corp., et al.*
　　　　　　**Civil Action No. 19 Civ. 10973 (VEC)**

Dear Judge Caproni:

　　　　This office represents named plaintiffs Bernardo Martinez ("Martinez"), Lamine Zerbo ("Zerbo"), Mohammed Kamara ("Kamara" and, together with Martinez and Zerbo, the "Named Plaintiffs"), Ebelio Perez ("Perez") and Saul Cepin ("Cepin" and, together with Perez, the "Opt-in Plaintiffs" and, collectively with the Named Plaintiffs, the "Plaintiffs"). We write, jointly with Matthew E. Cohen, Esq., counsel for Midspan Telecom Corp. ("Midspan") and Richard Grullard ("Grullard" and, together with Midspan, the "Midspan Defendants"), and Holly G. Rogers, Esq. and Mathew W. Beckwith, Esq., counsel for Insperity PEO Services, L.P. ("Insperity"), pursuant to the Fair Labor Standards Act ("FLSA"), the Second Circuit's decision in *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 206 (2d Cir. 2015) and the Court's August 20, 2020 Order. Counsel for the parties respectfully submit that the attached negotiated Settlement Agreement (Exhibit A) constitutes a fair and reasonable compromise of this matter which should be approved by the Court.

## I.　Procedural History and Plaintiffs' Allegations

　　　　The Named Plaintiffs commenced this action by filing their Class & Collective Action Complaint in the Southern District of New York ("SDNY") on November 27, 2019. (Dkt. No. 1). On January 24, 2020, the Court referred the case to the SDNY Mediation Office for settlement purposes, as part of the Court's pilot program for cases involving FLSA claims. (Dkt. No. 22). The Court additionally ordered that the deadline for Defendants to answer or otherwise respond to the Complaint be stayed until thirty (30) days after the conclusion of the mediation. (*Id*.). Thus, as of the date of this submission, none of the Defendants in this matter have filed an answer to Plaintiffs' Complaint. On December 20, 2019 and April 6, 2020, respectively, Plaintiffs Perez and Cepin exercised their right to join the present lawsuit by filing a Consent to Become a Party Plaintiff form on ECF. (Dkt. Nos. 11, 23).

Although Defendant Zayas was served at Midspan's warehouse, located at 724 Garrison Avenue, Bronx, New York 10474, on December 19, 2019, Plaintiffs never received a formal response to their Complaint from Defendant Zayas. On February 20, 2020, Plaintiffs sent a notice of default, enclosing Plaintiffs' Complaint, to Zayas stating that Plaintiffs would move forward with seeking a default judgment against him if they did not receive a response within five (5) business days. Subsequently, on July 13, 2020, Plaintiffs' counsel filed a Proposed Certificate of Default, which was issued by the Clerk of Court on July 14, 2020. (Dkt. No. 17). The Clerk's Certificate of Default was promptly sent to Defendant Zayas by mail, along with a reminder of the upcoming mediation. As part of the settlement, Plaintiffs are releasing any claims they have against Defendant Zayas.

In anticipation of mediation, Plaintiffs produced two hundred and sixty-four (264) pages of records, which included service lists allegedly showing the jobs that certain plaintiffs performed and the incentive rates that they claim they were paid for each task, an employee schedule allegedly containing the names and scheduled hours of Midspan's technicians, paystubs, documents allegedly showing the dates that Plaintiff Zerbo worked and the job number, work order and address of the jobs allegedly performed, a "Corrective Action Form," concerning an incident unrelated to the present claim, resulting in a one (1)-week suspension for Plaintiff Zerbo, screenshots purportedly showing payments made to Plaintiff Kamara, and screenshots purportedly from a Spectrum app through which Plaintiffs received jobs on their company cell phones..

Similarly, in anticipation of mediation, the Midspan Defendants produced two hundred and sixty-eight (268) pages of documents which included payroll and time records for the Named Plaintiffs and Opt-In Plaintiffs, purporting to show the compensation paid to and time worked by Plaintiffs and Opt-In Plaintiffs and a Waiver of Liability and Release Agreement signed by Opt-In Plaintiff Perez.

On July 23, 2020, the parties participated in a full-day mediation with James A. Brown, Esq. of the SDNY Mediation Program, during which they were able to reach a resolution on all issues.

## II. The Settlement Accounts for Litigation Risk

Throughout this litigation, the parties have held significantly different viewpoints on the underlying facts of this matter and Defendants' potential liability. Fundamentally, the parties dispute the number of hours that Plaintiffs worked and the manner in which they were paid. Plaintiffs allege that they worked as technicians who installed, disconnected and repaired cable, high-speed Internet and voice services on behalf of Defendants for Spectrum customers at various locations throughout New York City and Westchester County. Plaintiffs allege that they typically worked between forty (40) and ninety (90) hours per week, depending on the number and the nature of jobs to which they were assigned. Plaintiffs further allege that, throughout their respective employment periods, they were required to report to the Midspan Defendants' warehouse each morning by no later than 7:30 am to pick up equipment, including cable boxes, modems and routers, and a company van. Plaintiffs claim that they were additionally required to

return to the warehouse after they completed their final jobs each day to drop off the van and return equipment and tools. During periods when Plaintiffs were waiting to be assigned jobs, they further allege that they were required to wait in their vans out in the field or in the warehouse until at least the end of their scheduled shifts and were not permitted to return home.

For their work, Plaintiffs allege that they were paid a piece rate for the individual jobs that they performed, ranging from approximately forty to sixty-five dollars ($40.00-$65.00), which did not vary based on the amount of time they spent working on the job, such that they did not receive the statutory minimum wage for all hours that they worked, overtime premiums for hours worked in excess of forty (40) in a given week or spread-of-hours premiums when they worked in excess of ten (10) hours per day. Plaintiffs further allege that did not receive wages of any kind for time spent in the warehouse, traveling between jobs and the warehouse, waiting to be assigned jobs and participating in staff meetings.

Plaintiffs allege that they did not receive paystubs containing an accurate accounting of the hours that they worked. Specifically, Plaintiffs claim that, throughout their respective employment periods, they received paystubs that showed a total of zero (0) hours with a certain amount paid as "commission" or showed a low number of hours paid at a purported hourly rate, which they believe was calculated by dividing the total amount paid for the jobs Plaintiffs allegedly worked, paid on a piece-rate basis, by the minimum wage in effect at the time. Certain Plaintiffs additionally alleged that they received multiple checks (one for 40 hours of work at the applicable large employer minimum wage rate and one for the remainder of the amount owed for their total piece-rate earnings for the pay period). It is Plaintiffs' allegation that regardless of the precise manner in which their respective payments were presented, the amounts paid reflected payment only for the individual jobs that Plaintiffs completed on a piece-rate basis such that Plaintiffs did not receive a true hourly wage or overtime premiums for the work that they performed. Moreover, Plaintiffs claim that they did not receive a wage notice on their date of hire or when their pay rate changed, in violation of New York Labor Law § 195.

Throughout the litigation, Defendants vigorously denied Plaintiffs' allegations, including the number of hours that Plaintiffs claim to have performed services for Defendants and the method of payment received by Plaintiffs. As mentioned above, the Midspan Defendants' initial document production included certain records purporting to show the time worked by each of the Plaintiffs and Opt-In Plaintiffs. The Midspan Defendants' document production additionally included certain documents showing payment for up to forty (40) hours worked, plus certain "commission" payments if such "commission" payments were earned.

Generally, Defendants' timecards and payroll records show significantly fewer hours than Plaintiffs claim to have worked. For example, although Plaintiff Zerbo alleges that he worked between sixty (60) and ninety (90) hours throughout his employment with Defendants, according to the time cards produced by the Midspan Defendants, Plaintiff Zerbo only averaged approximately 43.43 hours per week. Similarly, according to such time cards, Plaintiff Martinez averaged approximately 39.7 hours per week, Plaintiff Kamara averaged approximately 42.13 hours per week, Plaintiff Cepin averaged approximately 39.22 hours per week, and Plaintiff Perez averaged 40 hours per week. Defendants further assert that dispatcher supervisors recorded the

times that Plaintiffs arrived back at the warehouse at the end of the day and that Plaintiffs had weekly conversations with such supervisors about whether the times on the time cards were accurate.

It is Plaintiffs' position that, throughout their respective employment periods, Defendants did not maintain a timeclock, sign-in sheet or other formal timekeeping system of any kind to track the total number of hours that Plaintiffs worked. Plaintiffs further claim that, while they received jobs through a Spectrum app that was installed on their company cell phones, which they used to indicate that they were on their way to a job, as well as the times that they started and ended a job, the app did not accurately track all hours that Plaintiffs worked, including travel time to and from jobs, time spent waiting for jobs, time spent in the warehouse and time spent participating in staff meetings.

However, although it is Plaintiffs' position the Midspan Defendants' time sheets are inaccurate, Plaintiffs recognize that the fact that the Midspan Defendants maintain pay records and time records provides a significant obstacle to succeeding on certain of their claims and that these documents could potentially limit the amount of damages, if any, that Plaintiffs could recover at trial if a factfinder credited Defendants' testimony and records in their entirety.

Plaintiffs and Defendant Insperity also vigorously disputed Insperity's liability for Plaintiffs' alleged damages. Defendant Insperity is a Professional Employer Organization ("PEO") that provided human resources and payroll services to Midspan employees during the relevant time period. It is Insperity's position that the company occupied a very limited administrative role and thus was not an "employer," as defined by the FLSA and NYLL. Insperity vehemently denies that it in any way exerted control over the terms and conditions of Plaintiffs' employment. Thus, Insperity denies liability for the Plaintiffs' claimed damages in their entirety. Insperity additionally claims that while it performed some payroll functions for the Midspan Defendants, the Midspan Defendants used another company to issue payroll checks when employees worked in excess of forty (40) hours per week.

Plaintiffs allege that during their respective employment periods, they were provided with an "Employment Agreement" from Insperity stating that Midspan and Insperity had agreed to a "co-employment relationship under which Insperity would handle certain administrative responsibilities concerning [their] employment at [Midspan]" and that Plaintiffs were "at-will employee[s] of Insperity." Thus, it is Plaintiffs' position that Insperity was a joint employer with Midspan, specifically with regards to payroll and other employment policies.

Due to the fact-intensive nature of these inquiries, it is likely that substantive answers to these disputed issues would not be resolved until after significant document and deposition discovery and motion practice, if not a trial. Based on these disputes, the parties engaged in good-faith, arm's-length settlement negotiations regarding not only Plaintiffs' FLSA claims, but also their pendent state law claims.[1]

---

[1] Such claims, of course, may be waived by private agreement. *Amaya v. Garden City Irrigation, Inc.*, 2011 U.S. Dist. LEXIS 15316, at *4-5 (E.D.N.Y. Feb. 15, 2011).

In advance of the July 23, 2020 mediation, Plaintiffs' counsel created an individual damages analysis based on a combination of the payment amounts contained in the Midspan Defendants' payroll records and Plaintiffs' best estimates of the hours that they worked. Plaintiffs' final damages analysis resulted in $53,286.58 in unpaid minimum wages, $38,059.83 in unpaid overtime damages and $8,708.14 in unpaid spread-of-hours premiums, for a total of $100,054.55 in "actual" wage damages.  Significantly, however, such calculations do not take into account the hours purportedly worked by Plaintiffs that are identified on documents produced by the Midspan Defendants which could drastically reduce the potential damages.  In fact, assuming *arguendo* that any wages were owed, utilizing such documents, counsel for the Midspan Defendants calculated that the combined total wages owed to Plaintiffs (including alleged minimum wage, overtime, and spread of hours) would equal only $14,582.96.

In light of the significant litigation risks outlined above, including the risk that Plaintiffs ultimately end up with less damages, if any, in light of Midspan Defendants' records, the parties believe that the settlement amount (i.e., $80,000.00) is a fair recovery. The parties believe this is a fair recovery based on the risks associated with establishing the calculated damages, the risks associated with proceeding to trial and Defendants' ability to pay, which, in light of the pandemic, was a substantial factor in ultimately reaching the settlement number that was agreed to by the parties.

Although there is a possibility that Plaintiffs could recover higher damages if the case proceeded to trial, there is also the possibility that they could receive much lower damages, or nothing at all. Perhaps the biggest litigation risk, however, is the Midspan Defendants' ability to pay a judgment if one were obtained by Plaintiffs. As a business that primarily sends technicians into customers' private homes, Midspan was closed completely for over three (3) months and has significantly slowed down operations since reopening due to the COVID-19 national health emergency. As such, rather than move forward with lengthy and costly litigation and potentially recover a judgment that may be impossible to collect, Plaintiffs prefer to settle now, on an individual basis, for an amount that they would be guaranteed to receive under the terms of the settlement.

### III.   Settlement Terms

As set forth in the attached Settlement Agreement, the parties have agreed to settle this action for a total settlement amount of $80,000.00 (the "Settlement Amount"). Of that amount, $27,217.72 is payable to Plaintiffs' counsel (including $826.65 in expense reimbursements and $26,391.07 in attorneys' fees). The remaining $52,782.28 is payable directly to Plaintiffs (the "Net Settlement Amount").

Keeping in line with the trend in this Circuit following *Cheeks*, the parties have agreed to a wage-and-hour release for any claims arising before Plaintiffs signed the Settlement Agreement. The parties also did not include a confidentiality provision and have specifically included language in the Agreement making it clear that nothing in the Agreement precludes the parties from truthfully communicating their experiences concerning the Action or Settlement.

The agreement includes a mutual non-disparagement provision between Plaintiffs and the Midspan Defendants. The parties recognize that Courts have held that broad one-sided non-disparagement provisions "can be contrary to public policy because they prevent the spread of information about FLSA actions to other workers (both employees of Defendants and others), who can then use that information to vindicate their statutory rights." *Gaspar v. Pers. Touch Moving, Inc.*, No. 13 Civ. 8187 (AJN), 2015 U.S. Dist. LEXIS 162243, *3 (S.D.N.Y. Dec. 3, 2015). However, not every non-disparagement clause in a FLSA settlement is *per se* objectionable. *See Lopez v. Nights of Cabiria LLC*, 96 F. Supp. 3d 170, 180 n.65 (S.D.N.Y. 2015). Here, the non-disparagement clause contained in this agreement is permissible for two reasons:

1) Initially, the non-disparagement provision is mutual and binds Plaintiffs and Defendants. Following *Cheeks*, Courts have approved settlements containing mutual non-disparagement clauses. *See Sadana v. Park Li, Ltd.,* No. 15-CV-8772, 2015 U.S. Dist. LEXIS 19122, at *2-3 (S.D.N.Y. Feb. 17, 2016) (approving the inclusion of a mutual non-disparagement clause in a FLSA settlement agreement); *Caprile v. Harabel*, No. 14-CV-6386, 2015 U.S. Dist. LEXIS 127332 at *3 (S.D.N.Y. Sept. 17, 2015) (post *Cheeks* decision approving mutual non-disparagement clause but rejecting the inclusion of a confidentiality provision).

2) Moreover, in recognition of the public policy interest favoring the disclosure of information relating to this action, the non-disparagement clause contains a "carve-out" provision permitting the Parties to make truthful statements about their experience in this litigation. Courts have held that such a "carve-out" provision provides an equitable balance between Plaintiffs' rights under the FLSA, and Defendants' interest in preventing the dissemination of defamatory statements. *See Cionca v. Interactive Realty LLC*, No. 15-CV-05123 (BCM), 2016 U.S. Dist. LEXIS 77372 at *8 (S.D.N.Y. July 10, 2016) (a clause which bars a plaintiff from making negative statements about a defendant "must include a carve-out for truthful statements about [a plaintiff's] experience in litigating [her] case."); *Lopez v. Poko-St. Anns L.P.,* No. 15-CV-4980 (BCM), 2016 U.S. Dist. LEXIS 46862 at fn. 1 (S.D.N.Y. April 4, 2016) (approving bilateral non-disparagement clause containing a "carve-out" provision for truthful statements); *Panganiban v. Medex Diagnostic & Treatment Ctr. LLC,* No. 15-CV-2588 (AMD)(LB), 2016 U.S. DIST LEXIS 29158 at * 6 (E.D.N.Y. Mar. 7, 2016) (approving reciprocal non-disparagement clause with a "carve out" for truthful statements about [plaintiff's] experience litigating the FLSA action); *Cortes v. New Creators, Inc*., No. 15 Civ. 5680, 2016 U.S. Dist. LEXIS 79757, *4 (S.D.N.Y. June 20, 2016) (approving non-disparagement clause that "includes the requisite 'carve-out' for truthful statements about plaintiffs' experience litigating this case").

As well, the mutual non-disparagement clause is bolstered by additional provisions that permit either party to commence an action in the event of a breach of the agreement and to obtain reasonable attorneys' fees in the event that they prevail.

**IV.    Plaintiffs' Attorney's Fees and Expenses**

As set forth in the attached Affidavit of Brent E. Pelton, Esq. (Exhibit B), as of September 18, 2020, Plaintiffs' counsel has spent more than 87 hours in prosecuting and settling this matter, resulting in a lodestar of $24,027.25 Plaintiffs' counsel has spent $826.65 in actual litigation costs. The portion of the settlement amount that Plaintiffs seek as attorneys' fees (i.e., $26,391.07) represents one-third (1/3) of the settlement amount, after subtracting the actual litigation costs, which represents a modest multiplier of the lodestar and is consistent with what was agreed upon between the Plaintiffs and their counsel in their retainer agreements. The retainer agreement between Plaintiffs and their counsel set forth a contingency fee of one-third (1/3) of any settlement, plus reimbursement of actual litigation costs.

The hourly billing rates utilized by Plaintiffs' counsel in calculating the lodestar are within the range paid to attorneys of similar experience and professional focus in the Southern District of New York. In fact, similar rates have been approved in connection with a recent wage and hour settlement in the Eastern District. *See Hall v. Prosource Techs., LLC*, 14-cv-2502, 2016 U.S. Dist. LEXIS 53791 at *38-41 (E.D.N.Y. April 11, 2016). Accordingly, Plaintiffs' counsel submits that the attorney's fees component of the settlement is fair and reasonable.

For the purposes of this settlement, Defendants take no position with respect to counsel's request for attorneys' fees and leave to the Court's determination provided that such attorneys' fees and costs are solely paid out of the Settlement Amount in accordance with the Settlement Agreement.

## V. The Parties Believe that the Settlement Is Fair and Reasonable

An FLSA settlement should receive judicial approval where it is "fair and reasonable." *See Cheeks*, *supra*; *Wolinsky v. Scholastic, Inc*. 900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012).[2] Generally, there is a "strong presumption in favor of finding a settlement fair," as "the Court is generally not in as good a position as the parties to determine the reasonableness of an FLSA settlement." *Crabtree v. Volkert, Inc.*, No. 11-cv-0529, 2013 U.S. Dist. LEXIS 20543, at *8 (S.D. Ala. Feb. 14, 2013). Moreover, "[c]ourts approve FLSA settlements when they are reached as a result of contested litigation to resolve *bona fide* disputes." *In re Penthouse Executive Club Compensation Litig.*, No. 10-cv-1145, 2014 U.S. Dist. LEXIS 5864, at *22 (S.D.N.Y. Jan. 14, 2014) (noting that the inherent adversarial nature of a litigated FLSA case is an adequate indicator of fairness of settlement). In considering whether a settlement is fair and reasonable, the principal question is "whether the agreement reflects a 'reasonable compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by an employer's overreaching.'" *Le v. SITA Info. Networking Computing USA, Inc.*, No. 07-cv-86, 2008 U.S. Dist. LEXIS 20786 at *2 (E.D.N.Y. Mar. 13, 2008) (*quoting Lynn's Food,* 679 F.2d at 1354). Although the FLSA places "limits on

---

[2] The parties note that *Cheeks* relies heavily on the Eleventh Circuit's decision in *Lynn's Food Stores, Inc. v. United States Dep't of Labor*, 679 F.2d 1350, 1355 (11th Cir. 1982), and that the Eleventh Circuit itself has subsequently contemplated that the supervision doctrine laid out in that case may apply only where a "compromise" of an FLSA claim has occurred. *Silva v. Miller*, 307 Fed. Appx. 349, 351 (11th Cir. 2009).

an employee's ability to waive claims . . . for fear that employers would [otherwise] coerce employees into settlement and waiver," *Wolinsky*, 900 F. Supp. 2d at 335 (alteration in original) (internal quotation marks omitted), "these concerns are not as relevant when the plaintiffs no longer work for the defendant, as is the case here." *Cisneros v. Schnipper Restaurant LLC*, No. 13-cv-6266, 2014 U.S. Dist. LEXIS 2111, *3 (S.D.N.Y. Jan. 8, 2014).

Here, there is no question that the settlement did not come about because of "overreaching" by the employer. To the contrary, the settlement was the result of vigorous arm's-length negotiations, including a full-day mediation with James A. Brown, Esq. of the SDNY Mediation Program. The parties are represented by counsel experienced in wage and hour law who duly counseled their respective clients on the benefits and risks of continued litigation. The negotiated settlement is fair and reasonable when considered in the context of the litigation risks faced by Plaintiffs and the risk that recovery after trial would be less than the negotiated settlement amount. Settlement at this stage of the case unquestionably constitutes the most efficient and effective conclusion to this litigation. Defendants asserted legitimate substantive defenses which highlighted substantial risk to Plaintiffs' ability to continue this FLSA litigation. *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 115 (2d Cir. 2013) (FLSA protects only minimum wage and overtime). Arm's-length negotiations between knowledgeable counsel followed, culminating in a negotiated resolution with the assistance of a Court-assigned mediator.

\* \* \* \* \*

As demonstrated above, the settlement is a result of substantial negotiations and compromise by both parties. The parties believe that the settlement is completely fair, reasonable, and adequate to the Plaintiffs and respectfully request that the Court approve the Agreement.

We appreciate Your Honor's attention to this matter. Please contact the undersigned counsel for the parties should you have any questions regarding this submission.

Respectfully submitted,

| | |
|---|---|
| **PELTON GRAHAM LLC** | **KAUFMAN DOLOWICH & VOLUCK, LLP** |
| By: */s/ Brent E. Pelton, Esq.* | By: */s/ Matthew Cohen, Esq.* |
| Brent E. Pelton, Esq. | Matthew Cohen, Esq. |
| Taylor B. Graham, Esq. | Keith Gutstein, Esq. |
| 111 Broadway, Suite 1503 | 135 Crossways Park Drive, Suite 201 |
| New York, New York 10006 | Woodbury, New York 11797 |
| Tel.: (212) 385-9700 | Tel: (516) 681-1100 |
| | *Attorneys for the Midspan Defendants* |
| *Attorneys for Plaintiffs* | |

**MELICK & PORTER LLP**

By: ___*Mathew Beckwith, Esq.*_____
Holly G. Rogers, Esq.
Mathew Beckwith, Esq.
800 Third Avenue, Ste. 28
New York, NY 10022
Tel.: (212) 541-7236

*Attorneys for Insperity PEO Services, L.P.*

Enclosures

cc:     All counsel (via ECF)